UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

          Plaintiff,               CRIMINAL NO. 09-20224

      v.                    DISTRICT JUDGE VICTORIA A. ROBERTS

NEIL CHAPPLE (D-7),         MAGISTRATE JUDGE VIRGINIA M. MORGAN

          Defendant.[1]
_____/

## REPORT AND RECOMMENDATION
## TO DENY DEFENDANT NEIL CHAPPLE'S
## AMENDED MOTION TO SUPPRESS (D/E #107)

### I. Introduction

This matter comes before the court on defendant Neil Chapple's "Amended Motion to Suppress - July 3, 2008" (D/E #107). Defendant seeks to suppress evidence arising out of a traffic stop of defendant by Trooper Robert Prause of the Michigan State Police on July 3, 2008. The government filed a response in opposition to the motion (D/E #136) and this court heard oral arguments and conducted an evidentiary hearing with respect to the motion on January 12, 2010 and January 15, 2010. For the reasons discussed below, the court recommends that defendant

_____

[1]Defendant Neil Chapple was indicted along with ten co-defendants: George Williams, Brandon Williams, Nancy Williams, Yolando Young, Ernest Larry Adams, Webb Smith, Gregory Palmer, Nathaniel Darryl Williams, Anthony Richardson, and Katrina Lyons.

Chapple's amended motion to suppress be **DENIED** and that the evidence obtained or derived from the July 3, 2008 traffic stop not be suppressed.

## II. Background

### A. Indictment

In this case, defendant Chapple and ten co-defendants are charged together in an Indictment (D/E #4). In the "General Allegations" section of the indictment, the government alleges that the named defendants and others engaged in a scheme and pattern of illegal conduct involving prescription drug controlled substances and fraudulent health care billings. (Indictment, p. 1) The Indictment alleges that George Williams organized and operated a purported health care business under the name Quick Response Medical Professionals, P.C. ("QRMP"). (Indictment, pp. 1-2) Brandon Williams and Nancy Williams assisted in the creation and operation of QRMP. (Indictment, p. 3) Brandon Williams and Nancy Williams are also alleged to have caused fraudulent Medicare billings in connection with QRMP. (Indictment, p. 3)

According to the Indictment, George Williams recruited fake patients to see doctors employed by QRMP, with QRMP employee Yolanda Young scheduling the visits and instructing the patients to ask for particular controlled substance prescriptions with a high street value. (Indictment, p. 2) Other employees of QRMP included Gregory Palmer and Darryl Williams, who transported most of the patients, and Anthony Richardson, who worked as a security guard protecting the cash and keeping order. (Indictment, p. 2)

The patients were paid up to $220 for their time and use of their Medicare card, but they did not retain the prescriptions. (Indictment, p. 2) The prescriptions were retained by George Williams, who had them filled at various cooperating pharmacies. (Indictment, p. 2) The controlled substances were then picked up by George Williams, Webb Smith, and/or Ernest Larry Adams. (Indictment, p. 2) Employees such as Smith or Adams were then directed to deliver the controlled substances to distributers in exchange for money. (Indictment, p. 2) One of the alleged distributers was Katrina Lyons. (Indictment, pp. 2-3)

In the specific counts of the indictment, Chapple is charged in Count One ("21 U.S.C. §§ 846, 841(a)(1) - Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances"); Count Four ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances -Oxycodone"); Count Eight ("21 U.S.C. § 841(a)(1) - Possession with Intent to Distribute Controlled Substances -Oxycodone")[2]; and Count Eighteen ("Forfeiture Allegations (18 U.S.C. 981(a)(1)(C), and 28 U.S.C. 2461(c); 21 U.S.C. § 853)"). With respect to the specific possession with intent to distribute charges, Count Four is only against Chapple and it relates to a July 3, 2008, while Count Eight is against both Chapple and Adams and it relates to an October 27, 2008 incident.

**B. Motion to Suppress**

---

[2]According to the government, due to a clerical error, the Indictment refers to Oxycontin in Count Eight when the drug actually seized was Vicodin. The government also asserts that the error will be corrected before trial by either a stipulation or a superseding indictment.

On November 3, 2009, defendant filed the amended motion to suppress pending before the court (D/E #107). In that motion, Chapple argues that the drugs and firearm seized on July 3, 2008, were seized in violation of the Fourth Amendment and must be suppressed because (1) the initial traffic stop was improper; (2) the traffic stop was extended beyond what was reasonably necessary to issue a traffic citation; (3) the traffic stop was extended without reasonable suspicion of further criminal activity; and (4) the dog alert was too unreliable to constitute reasonable suspicion sufficient to search the car.

On January 4, 2010, the government filed its response to defendant's amended motion to suppress (D/E #136); arguing that evidence will show that the July 3, 2008 stop was a valid traffic stop for tailgating and that, during the traffic stop, reasonable suspicion was developed to detain the vehicle until a K-9 dog unit arrived. The government also argues that defendant consented to wait until the drug dog arrived and that probable cause to search was created when the drug dog gave a positive alert on the vehicle.

On January 22, 2010, defendant filed a supplemental brief in support of his motion to suppress (D/E #151). In that supplemental brief, defendant argues that defendant did not consent to a further encounter after the conclusion of the traffic stop. Defendant also argues that Trooper Prause never had a sufficient reasonable and articulable suspicion that criminal activity was afoot to justify the call for a drug-sniffing dog or the fifty minute restriction on Chapple's liberty to wait for the dog.

On February 2, 2010, the government filed a supplemental response brief (D/E #163). In that supplemental brief, the government argues that, once defendant was told that he was free to

leave, defendant was no longer detained and any further contact was consensual. The government also argues that Prause had an objective, valid reason to detain defendant's vehicle until he determined that it was not stolen. The government further argues that the evidence showed sufficient reasonable suspicion of drug trafficking to support a twenty-two minute additional wait for the arrival of the drug dog.

### C. Evidentiary Hearing

The first witness to testify at the evidentiary hearing was Robert Prause. On July 3, 2008, Prause worked as a trooper with the Michigan State Police[3] and, on that date, he was assigned to the traffic unit for the holiday weekend. Specifically, Prause was positioned in the center median of I-75 and observing the traffic driving southbound. Prause was in a marked police vehicle.

According to Prause, around 6:55 p.m., he noticed a white Ford Expedition traveling southbound and less than one second behind a white Chevy Lumina. Prause also testified that maintaining a safe distance requires at least two seconds or more when the cars are traveling at 70 miles per hour, like those vehicles were. Prause further testified that a safe distance requires at least seven car lengths at 70 miles an hour, and that the white Expedition was only a car length and a half behind the Lumina. Prause does not recall if the Lumina ever slowed down, but he saw the Expedition right behind the Lumina at the same distance and pace for a period of time.

---

[3]Prause now works as the Sergeant-in-Charge of the Traffic Enforcement Unit at the Green County Sheriff's Department in the state of Georgia.

Prause stated at the evidentiary hearing that, after he observed the two vehicles, he took off after the Expedition, turned his overhead lights on, and made a traffic stop. Prause also testified that a camera in his car was activated when he turned on his emergency lights and that much of the encounter in this case was recorded through that car video camera and an audio device worn by him. A video of that recording was submitted as evidence and viewed by this court and the parties.

According to Prause, the Expedition initially pulled over to the left hand side of the roadway, but Prause told the driver, later identified as defendant Chapple, to pull over to the right hand side of the roadway. Prause spoke to defendant over car's public address system. Prause also testified that he had no knowledge of defendant or the passenger prior to making the traffic stop, though he could see that defendant was a black man and the passenger was a white woman. The passenger was later identified as Mollie Strough, a resident of Kentucky. As seen on the videotape, the traffic stop started between 18:55:50 and 18:56:30.

Prause further testified that he and defendant spoke outside of their vehicles. Defendant told Prause that defendant had been forced to slam on his brakes because the Lumina had suddenly braked. At one point, Prause told defendant that he had the tailgating on videotape, but this was not true. During the evidentiary hearing, Prause testified that he told defendant that the tailgating was recorded because defendant was exhibiting different mood swings and informing defendant that the tailgating was on videotape might calm defendant down a little.

Prause testified that defendant would not maintain eye contact with him, and that defendant continuously looked to the ground or back at the vehicle. Prause also testified that

defendant was moving back and forth, placing his arms across his chest, rubbing his arms, and trying to intimidate Prause. This is consistent with the videotape. Prause testified that although defendant was not yelling or making verbal threats, defendant was intimidating because of his demeanor, his large presence, the way he was standing, the way defendant raised his voice, and the way he tried to control the situation. Defendant also made a comment that Prause was engaging in racial profiling. Prause further testified that such behavior is consistent with his experience in narcotic arrests. When asked where he was going, defendant told Prause that he and his girlfriend were returning to Louisville, Kentucky, from Detroit, Michigan. They had been in Detroit for defendant's family reunion, though defendant eventually decided not to go. They were going to Louisville to pick his girlfriend's sister and, the next day, they were going to go to Cedar Point, an amusement park in Sandusky, Ohio, for the rest of the weekend. When repeating the plans, defendant said they were picking up his girlfriend's cousin rather than her sister.

While Prause had initially decided to issue defendant a traffic citation, he changed his mind and gave defendant a verbal warning instead. Prause testified that, after he issued defendant a verbal traffic warning, he told defendant that defendant was "good to go." As seen on the videotape, Prause told defendant he was "good to go" at 19:03:44. Prause conceded at the evidentiary hearing that, when he told defendant that defendant was good to go, the traffic stop was concluded. However, in Prause's mind, defendant was not free to leave. Prause also testified that he and defendant then engaged in a consensual conversation regarding a trip to South America that defendant had taken.

Eventually, Prause asked for the name of defendant's passenger and said, "I'm going to go talk to her for a second, okay?" As seen on the videotape, Prause asked that at 19:04:15. Prause also testified that defendant then agreed to let Prause talk to the passenger. Prause further testified that, if defendant had not consented to Prause speaking to the passenger, Prause would have called for the canine unit right then. According to Prause, in his mind, defendant was not free to leave from the moment he completed the traffic stop. Prause also testified that, when he spoke with the passenger, her story differed from defendant's story. While defendant said that they were going to Kentucky to pick up her sister or cousin, the passenger said they were going to Cedar Point that night. Prause noted that Cedar Point was closing in a few hours and that the Expedition was more than an hour away. The passenger also mentioned that they would also be going to a family reunion in Louisville for her family the next day. After talking to the passenger, Prause again asked defendant about defendant's destination and plans. Defendant reiterated his earlier responses.

Prause testified that, during his conversations with defendant and defendant's passenger, he decided to pursue an investigation. According to Prause, the factors that lead to him deciding to pursue an investigation included the differences between defendant's story and the passenger's story, defendant's nervousness, and the fact that defendant's rental vehicle was very clean and overdue. Prause also noticed that the rental car had been detailed through an expensive detailing process which is unusual for rental vehicles. Prause also testified that he noticed an overwhelming odor of air freshener and cologne or perfume when he approached the car, and he believed that odor was being used to mask the odor of drugs. In Prause's experience,

masking odors is common in the drug courier business. Furthermore, the rental agreement for the car had expired ten days earlier.

At one point, around 19:07:30 on the videotape, Prause asked defendant about guns, Xanax, Ecstasy and cocaine. Prause testified that defendant's demeanor did not change when asked those questions. Prause did not ask defendant about Oxycontin. According to Prause, when he asked defendant if there were narcotics in the car, defendant said no and told Prause to call for a dog. Prause asked defendant for consent to search the vehicle which was denied. Prause also testified that he then offered defendant a choice between consenting to the search or waiting for a drug-sniffing dog. In offering that choice, Prause told defendant that things would go quicker if defendant just consented to a search. Defendant told Prause to call the dog. As seen on the videotape, this exchange occurred at or around 19:07:50 to 19:08:15. Prause called in for a canine unit at 19:08:25.

While waiting for the dog, Prause called the rental car company because he had noticed that the rental contact given to him by defendant was overdue and he wanted to make sure the vehicle was not stolen. The rental car company representative informed him that defendant had already called in and extended his contract. As seen on the videotape, that phone call and conversation occurred between 19:17:00 and 19:19:24.

The video evidence in this case also records Prause speaking while he was waiting for the canine unit, but Prause testified that he does not recall who he was talking to while he was in the car. However, Prause also testified that he called an officer from the United States Border Patrol in order to request a canine unit, and that he believes he gave a synopsis of what evidence he

had.  Prause further testified that the Border Patrol's canine unit was unavailable and that Prause

next called Deputy Peters of the Monroe County Sheriff's office.  Deputy Peters was available to

conduct a canine search.

Prause testified that, through his experience and training, he had learned that Louisville

Kentucky, is "big" for Oxycontin and Xanax. The videotape of the traffic stop records Prause

making a statement to that effect while waiting for the canine unit at or around 19:38:33.  While

waiting for dog, defendant and his passenger were not restrained.  Defendant was able to use his

cell phone, talk to his passenger, and urinate on the side the Expedition.

Prause testified that Deputy Peters arrived shortly, three to five minutes, before they

could be seen in the video.  This was about the time Prause got out of his car and asked

defendant and defendant's passenger to move away from the Expedition.  On the videotape,

those actions were taken at 19:41:20.  After Deputy Peters arrived, they had a brief conversation.

Deputy Peters then had the dog perform an air sniff around the vehicle and the dog alerted.  As

seen on the videotape, the air sniff search occurred between 19:44:50 and 19:46:55.  After the

alert, Prause immediately decided to search the vehicle.  Following the search, 400 tablets of

Oxycontin, an unloaded gun, and some prescription cough medicine with codeine was found and

seized.

The second witness to testify at the evidentiary hearing was Deputy Jeremy Peters of the

Monroe County Sheriff's Department.  Deputy Peters works on the road patrol and in the canine

unit.  With respect to his training for the canine unit, he and his dog are certified as a team and

they have to be certified in tracking, drug work, obedience, bike work, article searches, and area

searches before the dog is put on the road. Deputy Peters testified that he and his dog Mia had been certified to work since early 2007. Deputy Peters also testified that Mia is still working with the Monroe County Sheriff's Department and she has never been decertified.

In the training process, every dog is trained on the odors of marijuana, heroin and cocaine. Deputy Peters also testified that his supervisors have told him that heroin has the same derivatives as other narcotics, such as Oxycontin and Vicodin, but that Mia was not specifically trained to detect Oxycontin. Deputy Peters further testified that Mia had alerted on vehicles containing Oxycontin and Vicodin prior the July 3, 2008 traffic stop without ever training on those drugs.

According to Deputy Peters on July 3, 2008, he received a call from Central Dispatch to respond to southbound I-75 at approximately the nine mile marker. Central Dispatch stated that a dog was needed for a search. Deputy Peters does not recall how long it took him to get to the scene. When he arrived, he spoke with Prause, with whom he had worked previously. Deputy Peters does not recall their exact conversation, but he believes Prause told him why Prause stopped the car and why he wanted the vehicle searched. Deputy Peters also believes that the conversation took less than a minute. Deputy Peters also testified that people exited the car to be searched when he was pulling up or when he had just arrived.

Deputy Peters then conducted a vehicle air sniff search. According to Deputy Peters, in a vehicle search, he searches the outside of the vehicle. He goes around the vehicle once, and then around the vehicle again in the other direction. Deputy Peters testified that the method he uses is standard procedure. Deputy Peters also testified that his dog is a very hyper-energetic dog so he

always goes around twice.  With respect to the search in this case, Deputy Peters stated that, on the first time around the vehicle, he started on the right rear side and worked up in the front and back down the driver's side.  When he got to the back right corner, Mia gave him a slight indication.  After the alert, Deputy Peters immediately started going back around the other way and, once they hit the back corner again, Mia gave him a second alert that Deputy Peters would characterize "as [if she smelled] an odor".  Deputy Peters testified that he then informed Prause of the results of the search.

Deputy Peters does not know by the dog's alert whether there are drugs in the vehicle or an odor or residue of drugs that used to be in the vehicle.  In this case specifically, Deputy Peters does not know if Mia was alerting on the Oxycontin or a remnant odor.  Deputy Peters also testified that Mia gets a reward when she alerts regardless of whether drugs are found.  However, Deputy Peters further testified that, though his training, he can tell if Mia is actually alerting or if she just wants a treat.  In this case Deputy Peters believes one hundred percent that Mia gave a solid indication.  Deputy Peters also testified that, during the training process, the dogs are presented with clean rooms and that the dogs are not certified if they alert on a clean room.

### III. Discussion

Chapple moves  to suppress evidence obtained and derived from a traffic stop and search conducted on July 3, 2008.  Both traffic stops and searches of automobiles are within the scope of the Fourth Amendment, see, *e.g.*, Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996); Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), and, accordingly, any evidence seized during an illegal traffic stop or search must be

suppressed as "fruits of the poisonous tree," Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008). "It is well settled that in seeking the suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." United States v. Rodriguez-Suazo, 346 F.3d 637, 643 (6th Cir. 2003) (quoting United States v. Feldman, 606 F.2d 679 n. 11 (6th Cir. 1979).

To assess defendant's arguments, the events in this case must be evaluated in segments and, as described below, there are four distinct segments: (1) Prause's initial traffic stop of defendant's vehicle; (2) the time period between the completion of the traffic stop and the decision to call for the canine unit; (3) the time period between the decision to call for the canine unit and the decision to search defendant's vehicle; and (4) the search of defendant's vehicle.

Defendant first argues that the initial traffic stop was improper. A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred. United States v. Sanford, 476 F.3d 391, 394 (6th Cir. 2007) (quoting Gaddis v. Redford Twp., 364 F.3d 763, 771 n. 6 (6th Cir. 2004). See also United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005) ("We have long held that so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." (internal quotation marks and citation omitted).

Probable cause is a reasonable ground for belief supported by less than *prima facie* proof but more than mere suspicion. United States v. Jackson, 470 F.3d 299, 306 (6th Cir. 2006) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). The requirements of

probable cause are satisfied "where 'the facts and circumstances within their (the officers')
knowledge and of which they had reasonably trustworthy information (are) sufficient in
themselves to warrant a man of reasonable caution in the belief that' an offense has been or is
being committed." Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed.
1879 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543
(1925)).

When a traffic stop is supported by probable cause, an officer's subjective intent is
irrelevant. Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).
As stated by the Sixth Circuit, "police officers [may] stop vehicles for any infraction, no matter
how slight, even if the officer's real purpose was a hope that narcotics or other contraband would
be found as a result of the stop." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008)
(quoting United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995).

In this case, this court finds that Prause had probable cause to believe that a traffic
violation had occurred and that, accordingly, the initial traffic stop was proper. As discussed
above, Prause testified that he observed defendant's Expedition traveling less than one second
behind a white Chevy Lumina and that maintaining a safe distance requires at least two seconds
or more when the cars are traveling at 70 miles per hour. Prause also testified that a safe
distance requires at least seven car lengths at 70 miles per hour, and that the white Expedition
was only a car length and a half behind the Lumina. Prause does not recall if the Lumina ever
slowed down, but he saw the Expedition right behind the Lumina at the same distance and pace
for a period of time. This court finds Prause to be credible on this issue. Prause's

misrepresentation to defendant that Prause had the tailgating on videotape does not lessen Prause's credibility. Prause freely admitted at the evidentiary hearing to misinforming defendant and he explained why he told defendant that the tailgating was on videotape. Moreover, defendant clearly admitted on the videotape that he slammed on his brakes to avoid the Lumina, which suggests that he knew he was tailgating. In light of defendant's concession, as well as Prause's testimony, this court finds the initial traffic stop was proper because Prause had probable cause to believe that a traffic violation had occurred.

Before the court can determine whether Prause had reasonable suspicion to detain defendant for drug activity, the court must first define the scope of the initial traffic stop. Once the scope and duration of the stop is determined, the court can then focus on whether Prause had a reasonable and articulate suspicion that criminal activity was afoot at the time of defendant's detention. In order to remain within the scope of the initial traffic stop, the officer's actions must reasonably relate to the purpose of the original stop. United States v. Bell, 555 F.3d 535, 541 (6th Cir. 2009) (In the absence of reasonable suspicion, "all the officer's actions must be reasonably related in scope to circumstances justifying the original interference.") (citing United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002) (internal quotations omitted))). However, asking for consent to search a vehicle does not unreasonably extend the scope of an ordinary traffic stop. United States v. Burton, 334 F.3d 514, 518-19 (6th Cir. 2003). The core question concerning when a traffic stop turns into a Fourth Amendment issue has been framed as: "at what point in time did the purpose of the traffic stop end and the detention of the driver and the

[vehicle's] occupants ... begin?"  <u>United States. v. Torres-Ramos</u>, 536 F.3d 542, 550 (6th Cir. 2008).

In <u>Torres-Ramos</u>, the purpose of a traffic stop for speeding ended when the driver was placed in the back of a patrol car and the passenger was questioned.  <u>Torres-Ramos</u>, 536 F.3d at 551.  Once the driver was placed in the patrol car for reasons such as failing to identify the owner of the vehicle he was driving, the court considered the original stop to have ended and a detainment requiring reasonable suspicion to have begun.  <u>Torres-Ramos</u>, 536 F.3d at 551.  The Sixth Circuit held, "[i]ssuing a speeding ticket does not require an officer to detain an individual in order to separately question a passenger regarding ownership or travel plans" and therefore concluded it was at this point that the original purpose of the stop ended.  <u>Torres-Ramos</u>, 536 F.3d at 551.  Similarly, in <u>Blair</u>, the purpose of a tag-light stop was fulfilled as soon as the officer obtained all the information necessary to write a citation for the violation.  <u>Blair</u>, 524 F.3d at 752.  Thus, as soon as the officer returned to the defendant's vehicle two minutes later and informed the defendant that a dog would be called to the scene, after consent to search was denied, the remainder of the stop required reasonable suspicion.  <u>Blair</u>, 524 F.3d at 752.

In this case, the purpose of the traffic stop ended when Prause told defendant that defendant was "good to go."  By that time, Prause had obtained all the information reasonably related to the purpose of the original stop, *i.e.* tailgating, and he had made the decision to issue a verbal warning instead of writing a citation.

Once the purpose of a traffic stop is completed, a police officer "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the

necessary reasonable suspicion to justify a further detention.'" United States v. Perez, 440 F.3d

363, 370 (6th Cir. 2006) (quoting Mesa, 62 F.3d at 162).  However, United States Supreme

Court cases make it clear that a seizure does not occur simply because a police officer

approaches an individual and asks a few questions.  So long as a reasonable person would feel

free "to disregard the police and go about his business," California v. Hodari D., 499 U.S. 621,

628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991), the encounter is consensual and no

reasonable suspicion is required.  "The encounter will not trigger Fourth Amendment scrutiny

unless it loses its consensual nature."  Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382,

2386 (1991).

In Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the

Supreme Court elaborated on what constitutes a consensual encounter:

> [L]aw enforcement officers do not violate the Fourth Amendment
> by merely approaching an individual on the street or in another
> public place, by asking him if he is willing to answer some
> questions, by putting questions to him if the person is willing to
> listen, or by offering in evidence in a criminal prosecution his
> voluntary answers to such questions.  Nor would the fact that the
> officer identifies himself as a police officer, without more, convert
> the encounter into a seizure requiring some level of objective
> justification.  The person approached, however, need not answer
> any question put to him; indeed, he may decline to listen to the
> questions at all and may go on his way.  He may not be detained
> even momentarily without reasonable, objective grounds for doing
> so; and his refusal to listen or answer does not, without more,
> furnish those grounds.  If there is no detention-no seizure within
> the meaning of the Fourth Amendment-then no constitutional
> rights have been infringed.

[Royer, 460 U.S. at 497 (citations omitted).]  "In short, because a consensual encounter does not

amount to a seizure, a police officer does not need reasonable suspicion or probable cause before approaching an individual to make an inquiry." United States v. Campbell, 486 F.3d 949, 954 (6th Cir. 2007) (citing United States v. Alston, 375 F.3d 408, 411 (6th Cir. 2004).

The Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure." Bostick, 501 U.S. at 434. Moreover, the Supreme Court has emphasized that a police encounter is only a seizure if the police, and not some independent factor, restrain the liberty of the defendant. For example, in INS v. Delgado, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), the INS had a practice of visiting factories at random and questioning employees to determine whether any were illegal aliens. Several INS agents would stand near the building's exits, while other agents walked through the factory questioning workers. The Supreme Court acknowledged that the workers may not have been free to leave their work site, but explained that this was not the result of police activity: "Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." Delgado, 466 U.S., at 218. The Supreme Court also concluded that there was no seizure because, even though the workers were not free to leave the building without being questioned, the agents' conduct should have given employees "no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer." Delgado, 466 U.S., at 218. Likewise, in Bostick, "[t]wo officers, complete with badges, insignia and one of them holding a recognizable zipper pouch, containing a pistol" boarded a bus and asked the defendant if they could inspect his ticket and identification. 501 U.S. at 431-32. The officers then explained that

they were looking for illegal drugs and asked the defendant for consent to search his luggage. Bostick, 501 U.S. at 432. The Supreme Court held that even though this encounter occurred in a cramped bus and Bostick did not feel free to leave (because he did not want to be left behind), it was not a seizure because the defendant's freedom of movement was restricted by a factor independent of police conduct, *i.e.*, by his being a passenger on a bus. Bostick, 501 U.S. at 436. As found by the Supreme Court, in such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. Bostick, 501 U.S. at 436. Put another way, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." Bostick, 501 U.S. at 436 (internal quotation and citation omitted).

"A seizure of an individual, on the other hand, occurs when under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." United States v. Campbell, 486 F.3d 949, 954 (6th Cir. 2007) (internal quotation omitted). "The police officer's subjective intent in detaining an individual is irrelevant so long as that intent is not conveyed to the individual in a way that results in the individual believing that he or she is not free to leave." Campbell, 486 F.3d at 954. See also United States v. Rose, 889 F.2d 1490, 1493 (6th Cir. 1989) ("[t]he subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct only to the extent that intent has been conveyed to the person confronted") (citing United States v. Mendenhall, 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). "Examples of circumstances that might

indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." <u>Mendenhall</u>, 446 U.S. at 554.

Here, this court finds that, after the traffic stop was concluded, Prause initially engaged in consensual conversations with defendant and defendant's passenger. In particular, the court would note that Prause never engaged in any coercive or intimidating behavior when speaking with defendant or defendant's passenger immediately after the traffic stop. Defendant argues that he could not consent to Prause speaking with the passenger and that, consequently, he was not free to leave while Prause did so. However, while defendant could not leave while Prause was speaking to the passenger, that confinement was the natural result of defendant's decision to wait while Prause spoke to her and it was not the result of any police action.

Moreover, Prause's statement was that he was going to speak with the passenger if it was okay with defendant, and that language suggests that defendant could decline the request. <u>See</u> <u>Campbell</u>, 486 F.3d at 956 ("The use of the word 'like,' as opposed to 'need' or "want,' suggests that a reasonable person would feel free to decline this request and leave the scene."). Nothing about Prause's request to speak with the passenger suggests that defendant's freedom to leave the encounter was conditioned on complying with the request.

Defendant also argues that the conversation was not consensual because Prause had already subjectively decided to detain defendant and that defendant was therefore not free to leave. However, as discussed above, Prause's subjective intent is irrelevant and the test is an

objective one looking at the totality of the circumstances. <u>Campbell</u>, 486 F.3d at 956. Here, looking at the totality of the circumstances, a reasonable person would feel free to decline the Prause's requests or otherwise terminate the encounter.

Nevertheless, even if the encounter between defendant and Prause continued in a consensual manner after the traffic stop was concluded, at the time that Prause told defendant that he was calling for a canine unit, the encounter had escalated to a <u>Terry</u> stop. The record reveals that Prause offered defendant a choice between consenting to a search of the vehicle or waiting for the canine unit, while noting that consenting to a search would be quicker. Neither of those choices allowed defendant to leave and an objective person in defendant's situation would not have felt free to leave. The government asserts that defendant mentioned calling for a dog first and argues, on the basis of that assertion, that defendant consented to waiting for the canine unit. However, this court agrees with defendant's argument that he was not free to leave after Prause decided to call for the canine unit, regardless of whether defendant mentioned it first. Given defendant's choices, consent to a search or wait for a canine unit, a reasonable person would not have believed that he was not free to walk away and, consequently, a seizure occurred. <u>Campbell</u>, 486 F.3d at 954.

Once a consensual encounter escalates to the point where the individual is "seized," the police officer must have a reasonable suspicion of criminal activity to justify a <u>Terry</u> stop in order for the seizure to comply with the Fourth Amendment. <u>Campbell</u>, 486 F.3d at 954. <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), governs traffic stops made on the basis of suspected criminal activity and, in evaluating the constitutionality of a <u>Terry</u> stop, the

court must engage in a two-part analysis of the reasonableness of the stop. First, the court asks "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." Davis, 430 F.3d at 354 (quoting United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993)). A Terry stop must be supported by specific and articulable facts that would "warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 21-22 (citations omitted). In other words, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing Terry, 392 U.S. at 27, 88 S.Ct. 1868). Additionally, the stop must be justified at its inception, and it must be reasonably related in scope to the circumstances which justified the interference in the first place. Terry, 392 U.S. at 19-20.

The court considers the totality of the circumstances to determine the validity of a Terry stop. Blair, 524 F.3d at 750 (citations omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008) (internal citation and quotation marks omitted). Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred. Pearce, 531 F.3d at 383; Dorsey v. Barber, 517 F.3d 389, 395 (6th Cir. 2008).

One case will seldom provide "useful 'precedent' for another" in evaluating reasonable suspicion.  Gates, 462 U.S. at 238 n. 11.  Thus, courts survey several cases and make a reasonable suspicion determination based on a totality of the circumstances.  See, *e.g.*, Torres-Ramos, 536 F.3d at 552-53; United States v.Garrido, 467 F.3d 971, 982-83 (6th Cir. 2006).  In Garrido, the Sixth Circuit's survey of the case law applying the reasonable suspicion framework lead to the following discussion:

> Compare United States v. Richardson, 385 F.3d 625, 630-31 (6th Cir. 2004) (concluding that the motorists' nervousness, their allegedly conflicting explanations of travel plans, and the movement of one from the back to the driver's seat did not suffice to create a reasonable suspicion); United States v. Townsend, 305 F.3d 537 at 542-45 (finding that ten factors, including dubious travel plans, three cell phones in the car, and the driver's history of weapons offenses, did not rise to the level of a reasonable suspicion); and United States v. Smith, 263 F.3d [571,] 588-94 [6th Cir. 2001] (concluding that nine factors, including the stoned appearance of one vehicle occupant, food wrappers in the car, and the nervousness of the occupants, did not establish a reasonable suspicion); with United States v. Davis, 430 F.3d 345, 355-56 (6th Cir. 2005) (holding that a driver's meeting with a known drug dealer justified continued detention until a drug-sniffing dog could arrive, but that additional detention after the dog failed to alert was unreasonable); [ United States v.] Hill, 195 F.3d [258] at 270-73 (concluding that eight factors, including a dubious explanation for a cross-country trip, nervousness, and the cash rental of a U-Haul, justified continued detention); and United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) (holding that eight factors, including the lack of registration and any proof of insurance, and the nervousness and criminal record of drug violations of the driver, sufficed to justify continued detention).

[Garrido, 467 F.3d at 982.]

In this case, Prause found defendant to be nervous.  Although nervousness can be given

little weight as it is "an unreliable indicator, especially in the context of a traffic stop. Many citizens become nervous during a traffic stop, even when they have nothing to hide or fear" Blair, 524 F.3d at 753 (quoting United States v. Richardson, 385 F.3d 625, 630-31 (6th Cir. 2004)), here the traffic stop was completed and defendant was "good to go." Likewise, defendant's destination of Louisville, Kentucky, is not *per se* indicative of illegal activity. See United States v. Urrieta, 520 F.3d 569, 576-577 (6th Cir. 2008) (noting that "travel between population centers is a relativity weak indicator of illegal activity because there is almost no city in the country that could not be characterize[d] as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center" (internal quotations omitted)). However, it was consistent with Prause's knowledge of drugs such as Oxycontin being transported from Detroit to Kentucky.

The discrepancies between defendant and his passenger's travel plans are clearly grounds for reasonable suspicion. See Hill, 195 F.3d at 272 (relying, in part, on inconsistencies in the claimed purpose of a trip as grounds for reasonable suspicion); United States v. Ellis, 497 F.3d 606, 614 (6th Cir. 2007) (holding that reasonable suspicion existed where an officer could not confirm an alias, there were discrepancies between the driver and the passenger on the reasons for their trip, and there were discrepancies on how much money the passenger had paid for the trip); United States v. Townshend, 305 F.3d 537, 543 (6th Cir. 2002) (stating that the Sixth Circuit has repeatedly recognized that lying about travel plans can form the basis for reasonable suspicion). In Hill, a police officer pulled over a U-Haul being driven by John J. Hill and containing John's brother, Scott Hill, as a passenger, for speeding, Hill, 195 F.3d at 261. In that

case, the brothers provided "inconsistent stories regarding their travel itinerary-i.e., John claiming that he and Scott were just going to drop off their sister's belongings and then leave; Scott claiming that the two were going to stay about three or four days and then leave; John claiming that their sister had flown out to Pennsylvania about a month beforehand, then claiming that she had assisted them in loading the truck, then claiming that she laid the belongings out for the men to load before she left ..." Hill, 195 F.3d at 272. The police officer later expanded the traffic stop into a Terry stop on the basis of the inconsistent stories and other factors.[4] Hill, 195 F.3d at 262. After a positive canine air sniff search, the police conducted a search and cocaine was found. Hill, 195 F.3d at 262-263. On appeal, the Sixth Circuit held that, when viewing the evidence in the light most favorable to the government and under a totality of the circumstances using a common-sense approach, the district court did not err in finding that the officer had formed a reasonable suspicion that defendants were carrying contraband sufficient to justify extending the purpose of the traffic stop to allow a dog to do a canine sniff of the U-Haul. Hill, 195 F.3d at 272-273.

Here, as in Hill, the discrepancies between defendant and his passenger's description of travel plans are grounds for reasonable suspicion. Defendant first told Prause that he and his passenger were returning from Detroit, where there had been a family reunion for his family, to Louisville, Kentucky. Once they got to Louisville, they were going to pick up someone defendant described, at various times, as his passenger's sister, or cousin. According to

_____

[4]Those other factors included the defendants' implausible explanation for their cross-country trip, the possibility that at least of one of the defendants were using cocaine, and the defendants' nervous demeanor during the stop. Hill, 195 F.3d at 271.

defendant, on the next day, they were going to go to Cedar Point and spend the rest of the weekend there. The passenger told Prause that she and defendant were going to Cedar Point that night and that, the next day, they were going to a family reunion for her family in Louisville. Defendant characterizes those differing accounts as having minor inconsistencies or changes, but this court views as significant the differences between statements regarding where they were going at that moment, where they had been, when they were going to get to their destinations, and who else was going to travel with them.

Moreover, in addition to the discrepancies between defendant and his passenger's travel plans, Prause had other grounds for reasonably suspecting criminal activity. For example, on its face, defendant's rental had expired. Additionally, the vehicle had been subjected to an expensive cleaning process, which is unusual for rental vehicles and may have been done in an attempt to remove drug odors. Similarly, Prause detected a strong order of cologne/air freshener, which could also be used conceal the odor of drugs. Defendant argues that factors such as the expired rental agreement, the cleaning process, and the odor of the car cannot be used in determining whether reasonable suspicion existed because Prause knew of those factors when he told defendant that defendant was "good to go." However, defendant's argument ignores the fact that reasonable suspicion is viewed under the totality of the circumstances. Viewing the totality of the circumstances, this court finds that the Terry stop was made with reasonable suspicion of further criminal activity.

If the basis for the Terry stop was proper, then the court must determine "whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by

examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." Davis, 430 U.S. at 354 (internal quotation marks and citation omitted). As part of the second prong, the court must "ascertain whether the detention is reasonable, that is, (1) was it sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available." Bennett v. City of Eastpointe, 410 F.3d 810, 825-26 (6th Cir. 2005) (internal quotation marks and citation omitted). For, while a Terry stop may be constitutionally permissible initially, it may become an impermissible "seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." United States v. Orsolini, 300 F.3d 724, 729-30 (6th Cir. 2002) (internal quotation marks and citation omitted); see also United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001) (citing United States v. Place, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)) (noting that "the Supreme Court has held that the passage of time can cause an investigative detention to ripen into a defective seizure that must be based upon probable cause").

The use of a drug-sniffing dog is a minimally intrusive means of investigating whether an officer's suspicion that a vehicle contained narcotics are valid, see Davis, 430 F.3d at 355, and the issue in this case is whether the detention was sufficiently limited in time. While there is "no rigid time limitation on the lawfulness of a Terry stop", the court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Orsolini, 300 F.3d at 730 (quoting United States v. Sharpe, 470 U.S. 675, 687, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). See, e.g., Blair, 524 F.3d 740 (noting, in dicta, the court's concern over the thirteen-

minute delay between the traffic stop's extension and the canine unit's arrival on the scene); Ellis, 497 F.3d at 613-614 (holding as constitutionally permissible a traffic stop lasting twenty-two minutes from the time of the stop until the time of consent to search); United States v. Walton, 258 Fed. Appx. 753, 754-55, 758 (6th Cir. 2007) (16-minute stop from time of stop until consent to search obtained held permissible). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop," Royer, 460 U.S. at 500, and the Sixth Circuit has "repeatedly held that a detention of property based upon reasonable suspicion may continue only for so long as it takes the officer to prove or disprove those suspicions", Davis, 430 F.3d at 356.

In this case, about thirty-six minutes passed between the start of the Terry stop and the decision to search defendant's vehicle. During that time, Prause properly investigated whether the rental car agreement was still valid. Prause also tried to arrange for a canine unit from the United States Border Patrol. After learning that the Border Patrol was unavailable, Prause called Deputy Peters, who was available. The videotape of the traffic stop recorded Prause twice asking someone how far away the canine unit was, at or around 19:11:20 and 19:20:00. Both times, Prause was told the canine unit was minutes away. After the canine unit arrived at 19:41:20, which was thirty-three minutes from the start of the detention, Prause had defendant and defendant's passengers move away from the car and the canine air sniff was conducted. Given the above actions, Prause diligently pursued a means of investigation that was likely to confirm or dispel his suspicions quickly, during which time it was necessary to detain defendant, and the Terry stop was sufficiently limited in time.

Defendant also argues that the dog alert was too unreliable to constitute probable cause sufficient to search the car.  It is well settled that a narcotics detection dog's alert to the presence of contraband within a vehicle establishes probable cause justifying a search of the vehicle for contraband.  See United States v. Diaz, 25 F.3d 392, 393-94 (6th Cir. 1994); United States v. Knox, 839 F.2d 285, 294 n. 4 (6th Cir.1988), cert. denied, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).  Moreover, "to admit evidence of a dog's alert to an aroma of drugs, it is not necessary to provide the dog's training and performance records, as it is similarly unnecessary to qualify a human expert in this way.  Rather, testimony as to the dog's record is sufficient."  United States v. Boxley, 373 F.3d 759, 761 (6th Cir. 2004).  See also Torres-Ramos, 536 F.3d at 554 (stating that the government need not produce actual certification records to establish the reliability of the dog and that testimony about the dog's training and reliability suffices).

In this case, the balance of the testimony at the evidentiary hearing supports a finding that Mia is reliable.  Deputy Peters testified to the dog's considerable training and prior certifications, which is sufficient to establish reliability.  Moreover, while Mia was only trained to detect the presence of heroin, cocaine and marijuana, and she alerted on the car without any such drugs being found here, there is insufficient evidence to suggest that Mia was unreliable.  As testified to by Deputy Peters, the dog may have been simply alerting on drug residue or on an odor consistent with a heroin derivative.  Because Mia is reliable and actively alerted to the van, the government established probable cause for a search of the van.

## IV. Conclusion

For the reasons discussed above, this court recommends that defendant Chapple's amended motion to suppress (D/E #107) be **DENIED** and that the evidence obtained or derived from the July 3, 2008 traffic stop not be suppressed.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v. Walters, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

S/Virginia M. Morgan
Virginia M. Morgan
United States Magistrate Judge

Dated: February 26, 2010

**<u>PROOF OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on February 26, 2010.

<u>s/Jane Johnson</u>
Case Manager to
Magistrate Judge Virginia M. Morgan